IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| VICKI LYNN YODER,<br><br>        Plaintiff,<br><br>v.<br><br>ANDREW M. SAUL,<br>Commissioner of Social Security,<br><br>        Defendant. | No. 19-00565-W- NKL-SSA |

**ORDER**

Plaintiff Vicki Lynn Yoder seeks review of the decision by the Administrative Law Judge ("ALJ") that she was not disabled within the meaning of Title II of the Social Security Act, 42 U.S.C. 401 et. Seq. For the reasons set forth below, the Court affirms the ALJ's decision.

I. **BACKGROUND**

On May 9, 2017, Yoder filed a Title II application for a period of disability and disability insurance benefits beginning June 1, 2011. Tr. 135. Because Yoder had acquired sufficient quarters of coverage to remain insured through June 30, 2018 (the "date last insured"), she would qualify for disability and disability insurance benefits only if she were to establish disability on or before that date. *Id*.; Doc. 10, p. 2. At the time of the application, Yoder was 60 years old. The basis of Yoder's claim was osteoarthritis, osteoporosis, degenerative bone disease, arthritis of the hands, bilateral knee replacement, bone spurs in the neck, chronic pain, depression, headaches, high blood pressure, and sleep apnea. Tr. 32. Yoder explained the basis for her disability claim as follows: "The pain in my, in my back and neck and shoulders just have gotten to the point of where the pain is just unbearable and so then I have trouble sleeping, which then causes a rough day, you know, at work with lack of sleep." Tr. 39.

1

From 2014 to 2016, Yoder had a job in production for 30 hours a week (which she described as "full time") for two years, bottling, packaging, and performing heavy lifting. Tr. 36. She states that she stopped working because she experienced too much pain from standing "on [her] feet all the time" and from performing "a lot of repetitious" work with her hands. Tr. 35. While thus employed, she would sew, crochet, cross-stitch, or perform other craft work for two to four hours daily. Tr. 894, 897. She continued to perform the handiwork through the date of the hearing before the ALJ, though she testified that "it's getting more difficult" to use her hands. Tr. 42.

Yoder testified that, until 2011, she worked at a bowling alley that she co-owns with her husband. Tr. 37-38. She stated that it had been two years since she worked. Tr. 35. However, her medical records show that, through at least August 2017, Yoder spent weekends cooking or working the counter at the bowling alley. Tr. 972. In June 2018, Yoder's medical care provider noted that Yoder reported "difficult[y]" using a gel medication for her arthritis because of "many daily tasks that require handwashing" Tr. 985.

At the time of the hearing, Yoder claimed to drive up to ten miles running errands. She also assisted a disabled neighbor with performing errands as required. Tr. 63; Doc. 10, p. 26. She has no issues using the stairs so long as she is not carrying anything. She can throw laundry in the machine and fold it, does some cooking, uses an iPad regularly, and, as aforementioned, performs some handiwork.

Yoder claims to have depression that results in three bad days a week, and she takes medication for depression that her primary care physician prescribed. Tr. 44, 46. However, medical records show that she denied having any "[d]ifficulty doing work, taking care of things at home, or getting along with others." Tr. 539 (May 2017), 666 (March 2015). She indicated that

she can pay attention as long as needed, finish what she starts, follow written and spoken instructions, get along "very well" with authority figures, get along with friends and family, and, though she does not handle stress well, she "gets through" changes in routine. Tr. 158-60.

The ALJ found that Yoder had the following severe impairments: cervical and lumbar degenerative disc disease; lumbar spinal facet pain syndrome; mild bilateral hip degenerative joint disease; osteoporosis; osteoarthritis of multiple joints, including the hands, feet, and bilateral hips, and status-post bilateral knee replacements. Tr. 14. Nonetheless, the ALJ concluded that Yoder had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b), meaning that she "could frequently lift up to 10 pounds, occasionally lift up to 20 pounds, stand and/or walk for up to 6 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday." Tr. 16. The ALJ then concluded that Yoder was capable of performing past relevant work, including as a bowling alley manager, and therefore was not disabled during the relevant period. Tr. 19.

## II. STANDARD

The Court must affirm the Commissioner's denial of social security benefits so long as "there was no legal error" and "the findings of fact are supported by substantial evidence on the record as a whole." *Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016). "Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). The Court must consider both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (quotation marks and citation omitted). However, "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence also exists in the record that would have supported a contrary outcome, or

because [the Court] would have decided the case differently." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (quotation marks and citation omitted).

The Court must "defer heavily to the findings and conclusions of the Social Security Administration." *Michel v. Colvin*, 640 F. App'x 585, 592 (8th Cir. 2016) (quotation marks and citations omitted).

## III. DISCUSSION

### a. Whether the ALJ's RFC as to Physical Limitations Is Supported by Substantial Evidence

Yoder argues that the ALJ's "selective adoption" at step four of portions of the opinion of the non-examining, non-treating physician employed by the State was impermissible.

"Through step four of this analysis, the claimant has the burden of showing that she is disabled." *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008). Thus, the burden of "providing medical evidence as to the existence and severity of an impairment" rests on the claimant. *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013).

In assessing the RFC, an ALJ may "consider the claimant's subjective statements about his capabilities." *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016). However, "[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* (quotation marks and citation omitted). Nonetheless, the RFC assessment "is ultimately an administrative determination reserved to the Commissioner.'" *Winn v. Comm'r of Soc. Sec. Admin*, 894 F.3d 982, 987 (8th Cir. 2018) (quotation marks and citation omitted).

The ALJ's RFC assessment was based in part on the opinion of Dr. Spence, a non-examining, non-treating State agency physician. Dr. Spence opined that Yoder could lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk and also sit for 6 hours in

an 8-hour workday. Tr. 59-60. The ALJ found these aspects of Dr. Spence's opinion "persuasive." Tr. [19]. Dr. Spence also opined that Yoder could occasionally climb ramps/stairs, balance, stoop, and crawl, but could never climb ladders/ropes/scaffolds, to "prevent symptom exacerbation and possible injury . . . ." Tr. 60. Dr. Spence further opined that, although Yoder's gross manipulation/handling is "[u]nlimited," her fingering in both hands is "[l]imited," explaining that the purpose of the latter limitation is "to prevent symptom exacerbation and possible injury." Finally, Dr. Spence opined that Yoder should "avoid concentrated exposure" to vibration, fumes, odors, dust, gases, poor ventilation, and hazards like unprotected heights and machinery. Tr. 60-61. The ALJ found these non-exertional limitations unpersuasive because they "are not supported by and are inconsistent with the entire medical record and the treatment findings . . . , as well as the claimant's testimony and reports regarding her ability to perform numerous activities of daily living." The ALJ gave examples of the inconsistency between Dr. Spence's opinion regarding Yoder's non-exertional limitations and her activities, stating that "the opinion of Dr. Spence limiting the claimant to only occasional fingering is inconsistent with the type of work she performed in 2014 through 2016, three to five years after the alleged onset date," and noting that Yoder "indicated she takes her neighbor to appointments and the store as needed, prepares all meals, and continues to knit, crochet, and sew." Tr. 19.

Yoder argues that "[t]he ALJ is not permitted to pick and choose [from] the opinions of record, adopting only those portions which would support a finding of non-disability." For this proposition, Yoder cites from within the Eighth Circuit one district court decision, *Taylor v. Barnhart*, 333 F. Supp. 2d 846 (E.D. Mo. 2004). However, the thrust of the *Taylor* opinion on this point is not that an ALJ cannot rely on some aspects of a report while disregarding others, but rather, that the ALJ's explanation for rejecting some evidence "must be set out in the decision."

5

*Id.* at 856 (quoting *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995)). Here, the ALJ explained that her decision to reject portions of Dr. Spence's opinion was based on medical records, including treatment findings, as well as testimony and documentation concerning Yoder's daily activities. Thus, the *Taylor* holding concerning failure to explain the decision to discount a medical opinion does not apply.

Yoder next argues that the ALJ's rationale for rejecting the postural and environmental limitations cannot withstand scrutiny. First, Yoder argues that, according to the ALJ herself, the "part-time" knitting, crocheting, and sewing Yoder performed between 2014 and 2016 did not rise to the level of substantial gainful activity, citing the ALJ's ruling that Yoder did not engage in substantial gainful activity between June 1, 2011 and the date last insured, despite the fact that she worked approximately 30 hours per week between September 1, 2014 and January 22, 2016. However, the ALJ's finding that Yoder did not engage in substantial gainful activity is not inconsistent with the finding concerning her fingering limitations. The fact that Yoder did not work a full-time job in the relevant period does not reflect in any way on her capacity for fingering. The ALJ's conclusion that Yoder's 30-hours a week bottling, packaging, and lifting objects and the additional hours she spent on handiwork each day undermined Dr. Spence's opinion regarding her capacity to finger was reasonable in light of the evidence in the record.

Yoder further argues that the "the ability to cross stitch and knit for 2 to 4 hours daily is not inconsistent with Dr. Spence's opinion Yoder could occasionally finger," and that Dr. Spence was aware of Yoder's activities when he issued his opinion regarding her limitations, and therefore the ALJ erred in disregarding Dr. Spence's opinions because of Yoder's activities. However, the ALJ relied not only on the handiwork, but also on the fact that Yoder had worked 30 hours a week in a production job for approximately two years. Tr. 19. Yoder argues that the work Yoder

6

performed was just part-time, and therefore does not undermine Dr. Spence's limitation to occasional fingering. However, the fact that Yoder performed a production job for 30 hours a week (work that Yoder characterized in the hearing as "full time," Tr. 36), in combination with Yoder's reports of two to four hours of handiwork daily (Tr. 894, 897), is substantial evidence that Yoder could do more than occasional fingering. *See Henderson v. Colvin*, No. C15-0081-CJW, 2016 WL 4599920, at *13 (N.D. Iowa Sept. 2, 2016) (finding that substantial evidence supported ALJ's finding that that claimant was able to frequently bilaterally handle and finger where she would dust, sweep, fix lunch, do dishes daily, shop weekly, pay bills, count change, "work on sewing and mak[e] bracelets" and also paint or draw daily "depending on hand and finger pains").

The record also shows that Yoder plays games on an iPad "throughout the day" and "occasionally . . . assist[s] a mentally challenged individual by providing transportation" to medical appointments or to a grocery store. Tr. 211. As late as June 2017, she had multiple "busy weekend[s] at the bowling alley . . . ." Tr. 910, 914, 918; *see also* Tr 912 ("Patient has busy weekend ahead of her at bowling alley."). In August 2017, even as she complained of joint pain and swelling, she told her medical care providers that "[s]he owns a bowling alley with her husband and she does a lot of work with cooking and at the counter." Tr. 972; *see Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992) (affirming ALJ's decision that claimant who "worked for several years despite complaining of the pain she now claims is disabling" could perform past relevant work).

While she reported "morning stiffness lasting for > 2 hours" in June 2018, the bilateral osteoarthritis was characterized as "mild." Tr. 983-985. She discontinued gel medication for pain at that time because of "many daily tasks that require handwashing" (Tr. 985)—which suggests

that she was working with her hands regularly. Thus, substantial evidence supports the ALJ's conclusion that Yoder was capable of performing work as a manager at least.

Yoder argues in the alternative that, after rejecting Dr. Spence's opinions, "the ALJ should have fulfilled her duty to develop the record fully and fairly and obtained some medical opinion from an examining or treating physician as to Yoder's functional limitations rather than relying on his own interpretation of the medical evidence." Doc. 10, p. 27. However, the Eighth Circuit has expressly held that "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). The ALJ's decision regarding the RFC was rendered at step four of the sequential evaluation process, where the burden was on Yoder to establish an inability to do past relevant work, and the ALJ was permitted to rely on a non-treating physician's report alone. *See Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (noting that Eighth Circuit case law "does not preclude the ALJ's reliance on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work").

The decisions that Yoder cites in support of her argument to the contrary do not warrant reversal. *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), concerned the ALJ's task at step five, when the burden shifts to the Commissioner. *See id.* at 857 ("In our circuit it is well settled law that once a claimant demonstrates that he or she is unable to do past relevant work, the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do. It is also well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel.") (quotation marks and citations omitted). In *Combs v. Berryhill*, 878 F.3d

8
Case 4:19-cv-00565-NKL   Document 15   Filed 05/11/20   Page 8 of 12

642 (8th Cir. 2017), the Eighth Circuit found that the ALJ erred in interpreting ambiguous language in treatment records so as to conclude that the claimant was not disabled. *See id.* at 647 ("Although Combs' medical providers consistently note in their treatment records that Combs has a normal range of motion, they likewise consistently diagnose her with rheumatoid arthritis, prescribe medications for 'severe pain,' and note 'trigger point' and 'joint pain with' range of motion. By relying on his own interpretation of what 'no acute distress' and 'normal movement of all extremities' meant in terms of Combs' RFC, the ALJ failed to satisfy his duty to fully and fairly develop the record.").

In both *Spackman v. Colvin*, No. 14-CV-4125-NKL, 2015 WL 518564, at *4 (W.D. Mo. Feb. 9, 2015), and *Burchard v. Astrue*, No. 08CV87SNLJ/LMB, 2009 WL 2836531, at *10 (E.D. Mo. Aug. 28, 2009), the ALJ had found that the claimant was disabled at step five of the sequential evaluation process, where the burden of proof shifts to the commissioner, and not at step four, where the burden remains with the claimant. Moreover, in *Spackman*, the Court required the ALJ to acquire additional medical opinions concerning the claimant's functional capacity because the medical evidence in the record was "inconclusive." *Spackman*, 2015 WL 518564, at *4.[1] Here, in contrast, the ALJ's RFC assessment was based on evidence concerning Yoder's daily activities, including her work at the bowling alley, as well as medical evidence—not just portions of Dr. Spence's opinion, but also the treatment records, which showed that many of Yoder's symptoms improved with treatment. Tr. 17-19. *See Hensley*, 628 F.3d at 995 ("In the absence of medical

---

[1] The decisions in *Spackman*, 2015 WL 518564, at **2–4, and *Burchard*, 2009 WL 2836531, at **16–17, are distinguishable for the additional reason that the ALJ in those cases discounted the opinions of the treating physicians in their entirety, leaving insufficient evidence to support the RFC assessment. Here, in contrast, Yoder, who bore the burden of establishing disability at step four, did not present any treating physicians' opinions concerning her capacity to work. The only medical opinion in the record regarding Yoder's physical limitations was that of Dr. Spence, and the ALJ relied on it in part in assessing Yoder's RFC.

9

opinion evidence, medical records prepared by the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.") (quotation marks and citation omitted).

Yoder argues that her conditions deteriorated after Dr. Spence issued his opinion, so that, "while on 2/1/16 Yoder continued to cross stitch and knit for 2-4 hours daily, by 5/8/17, she could no longer perform these activities on a daily basis." Doc. 10, p. 26 (citations omitted). However, as an initial matter, such an argument cannot rescue Yoder's claim for the period preceding May 2017. Moreover, Yoder's statement in her application that she could do crafts, knitting, crocheting, and sewing just one or two times a week (Tr. 158), and her husband's contradictory statement that she could do "[n]o sewing, knitting, painting, clay making, etc.," are undercut by the evidence, discussed above, that she was having "busy weekend[s] at the bowling alley," "cooking" and working "at the counter" through at least June 2017 and performing multiple tasks requiring hand washing in June 2018. Given that the burden of proving disability was on Yoder, her arguments do not warrant reversing the ALJ's assessment of Yoder's RFC.

### b. **Whether the ALJ's RFC as to Yoder's Mental Impairments Is Supported by Substantial Evidence**

Yoder argues that the ALJ erred in failing to include her findings regarding Yoder's mental limitations in the RFC. However, Yoder does not suggest how the mild limitations that the ALJ found in Yoder's understanding, remembering, and applying information, interacting with others, concentrating, persisting, maintaining a pace, and adapting or managing herself ought to have changed the assessment of her RFC.

Yoder cites a purported error in the opinion of the non-examining expert Dr. Toll, an agency psychologist, but Dr. Toll's note of a "depression screen score of 6" is consistent with the record. Tr. 551 (PHQ-2 Depression Screen Positive. Score: 6"). Moreover, Yoder does not

10

suggest how Yoder's "moderate" depression ought to change either Dr. Toll's assessment of Yoder's mental impairments as "non-severe" (Tr. 58) or the ALJ's assessment of Yoder's RFC. Yoder "has the burden to establish h[er] RFC," *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016), but she has not established that a more restrictive RFC was warranted here.

Yoder also complains that Dr. Toll relied on just a handful of records in rendering her opinion. On reply, for the first time, Yoder cites to portions of the record that she claims support mental restrictions.

> [R]ecords on 7/19/11 show increased depression. (Tr. 791). Her mood was concerned with a sad affect. (Tr. 792). She scored 12 on the PHQ-9 (moderate depression). (Tr. 793). In addition to medication, Yoder was referred to mental health to start counseling. (Tr. 794). On 5/17/12, Yoder scored 12 on the PHQ-9 (moderate depression). (Tr. 771). On 7/10/12, she scored 12 on the PHQ-9 (moderate depression). (Tr. 760) On 9/17/12, Paxil helped somewhat, but she still felt down. (Tr. 740). She scored 12 on the PHQ-9 (moderate depression). Diagnoses included depression. Paxil and Celexa were prescribed. (Tr. 742). Yoder called the office of P. Romero, PA, on 11/16/12. She felt everything drove her crazy, and she was biting her husband's head off all the time. Celexa was working at first, and she requested a dose increase, which was done. (Tr. 736).

Doc. 14, p. 10. Yoder argues that, "[h]ad Dr. Toll had the benefit of this additional evidence, Dr. Toll would likely have found 'moderate' rather than 'mild' limitations." However, this evidence does not establish that Yoder, who was working at her bowling alley around the same time, and who subsequently worked for two years in a 30-hour-a-week job in production, was limited by her depression.

Yoder also argues that "Dr. Toll's opinions are not substantial evidence to support the ALJ's decision." Doc. 10, p. 29. However, the ALJ did not rely on Dr. Toll's opinion alone; she considered Plaintiff's allegations and treatment records as well. Tr. 15. Yoder does not challenge the ALJ's statement that "[t]he limited mental status examinations in the record reveal the claimant generally presented with mostly normal findings, including normal mood and affect." *Id.* (citation omitted); *see* Tr. 572 ("Mood: Euthymic" and "Affect Normal" in April 2017); Tr. 898 ("PSYCH-

11

Oriented to time and place appropriate mood and affect" in June 2017); Tr. 962 ("Psychiatric: Appropriate mood and affect" in May 2018); Tr. 973 ("PSYCH-Oriented to time and place appropriate mood and affect" in August 2017)). *See Chesser v. Berryhill*, 858 F.3d 1161, 1167 (8th Cir. 2017) (holding that "doctors' observations of [claimant]'s mood and affect are relevant to the assessment of the severity of [claimant]'s symptoms"). Yoder received prescription drugs for her depression not from a mental health specialist, but from her primary care physician. Tr. 46

Moreover, Plaintiff denied having any "[d]ifficulty doing work, taking care of things at home, or getting along with others." Tr. 539 (May 2017), 666 (March 2015). She indicated that she can pay attention as long as needed, finish what she starts, follow written and spoken instructions, and get along "very well" with authority figures, and though she does not handle stress well, she "gets through" changes in routine. Tr. 158-60. Further, as discussed above, there is evidence that Yoder spent multiple weekends through at least the summer of 2017 working the counter and cooking at the bowling alley she co-owns with her husband—which suggests that mental issues did not interfere with her ability to work. Thus, substantial evidence in the record supports the ALJ's conclusion that Plaintiff's mental impairments did not impact Yoder's ability to work.

IV. **CONCLUSION**

Because the ALJ's decision is supported by substantial evidence in the record, the Court affirms the ALJ's decision.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: May 11, 2020  
Jefferson City, Missouri